**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EILEEN MASTERSON-CARR,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | **No. 19-2699** |
| **v.** | : | |
| | : | |
| **DREXEL UNIVERSITY COLLEGE OF** | : | |
| **MEDICINE,** | : | |
| **Defendant.** | : | |
| | : | |

**McHUGH, J.**                                                                **May 26, 2020**

### MEMORANDUM

This is an action brought under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*., and state law alleging that Defendant Drexel University College of Medicine ("Drexel") unlawfully terminated Plaintiff Eileen Masterson-Carr ("Masterson-Carr") in retaliation for seeking an extension of the leave to which she was entitled under the statute. Discovery has closed, and Drexel now moves for summary judgment. Because the record conclusively demonstrates that Drexel decided to terminate Masterson-Carr before she submitted her request for an extension, and it provided legitimate, nondiscriminatory reasons for doing so independent of that request, Drexel's Motion will be granted.

## I.    Relevant Background

### A.  The nature of Masterson-Carr's employment

Masterson-Carr was hired by the Drexel University College of Medicine in April 2015 as the Executive Director of Revenue Cycle Management in the Physician Services Business Department. (Mot. for Summ. J. ("MSJ") Ex. A, at DREXEL 00006-DREXEL 00007, ECF 13-

1.)[1]  Masterson-Carr was hired on the recommendation of Anthony Esposito, who was then

Associate Dean of Financial Affairs for the Drexel University Physicians Administration.  (*Id*. at

DREXEL 00007.)  Esposito was Masterson-Carr's direct supervisor throughout her tenure with

the College.  (Pl. Dep. 55:8-10; 99:2.)  Under Esposito's auspices, Masterson-Carr's job was to

ensure effective management of the Department's revenue.  (Ex. C, at 1; Pl. Dep. 50:24-51:21.)

Esposito gave Masterson-Carr favorable employee evaluations in both 2015 and 2016.

(*See* 2015 Performance Evaluation, Ex. D, at 7, ECF 13-2; 2016 Performance Evaluation, Ex. E,

at 8, ECF 13-2.)  Esposito specifically touted Masterson-Carr's role in identifying a vendor to

assist the physician group with an important transition in October 2015.  (Pl. Dep. 67:23-68:1.)

Indeed, Masterson-Carr testified that Esposito generally valued her performance as an employee

during this period.  (*Id*.)

Masterson-Carr worked autonomously and did not require Esposito's input or approval

for most of her work.  (*Id*. at 56:18-22; 160:23-161:4.)  Consistent with that premise, she was not

required to inform Esposito about the absences, lateness, or early departures of employees in her

department, and Esposito exercised no direct control over them.  (*Id.* at 157:19-22; 158:20-23;

160:13-22.)  But Masterson-Carr testified that Esposito expressed frustration at employee

absences and rolled his eyes when he learned an employee was not in the office.  (*Id.* at 63:8-

64:7.)  Still, Esposito never reversed Masterson-Carr's approval of an employee's request to be

absent from the office.  (*Id.* at 64:1-13; 64:20-24.)

---

[1] All exhibits cited in the Memorandum refer to those submitted with Drexel's Opening Brief given that only Drexel annexed documents for the Court's consideration.

### B. Masterson-Carr's first investigation for misconduct

Controversy began to surround Masterson-Carr beginning in the summer of 2016.  On August 22, 2016, an anonymous complaint reached the College's Office of Equality and Diversity ("OED"), alleging that "[Masterson-Carr had] used discriminatory language towards African American employees."  (OED Investigation Report, Ex. H, at 1, ECF 13-2.)  The complaint specified that, among other things, Masterson-Carr made stereotypical observations about the body parts of African American employees, including their hair and backsides, as well as incredulous references to the number of children they had.  (*Id.*)  OED launched an investigation headed by Compliance Specialist Kathleen Colgan, who interviewed Masterson-Carr and nine subordinates.  (*Id.* at 1-2.)  Colgan completed her investigation in November 2016, concluding that "based on a preponderance of the evidence standard . . . insufficient evidence [existed] to support a finding [that Masterson-Carr violated] the Equality and Non-Discrimination Policy."  (*Id.* at 18.)  But Colgan noted that the behaviors unearthed by the investigation "may have been inappropriate for the workplace."  (*Id.*)  Based on that conclusion, OED "referred [the matter] to Human Resources to address those behaviors."  (*Id.*)  On November 18, 2016, Colgan sent Masterson-Carr an email communicating OED's findings as well as her rights to appeal under university policy.  (Ex. J, at 1, ECF 13-3.)

### C. Masterson-Carr's use of FMLA

In March 2017, Masterson-Carr received approval for and used continuous leave under FMLA from March 13, 2017, through March 26, 2017.  (Ex. F, at DREXEL 00219-DREXEL 00220, ECF 13-2.)  Masterson-Carr's request provoked no negative reaction.  (Pl. Dep. 125:13-17.)  Not only was there no hint that the absences caused others to believe Masterson-Carr was ineffective (*id.* at 63:1-5), but she also never received a negative performance evaluation during her entire time at the College (*id.* at 71:18-20).  And Masterson-Carr was not alone in her use of

FMLA:  one of her direct reports took leave without being discharged despite Masterson-Carr's opinion, shared by Esposito, that the employee was a poor performer.  (*Id.* at 194:18-196:13.)

Masterson-Carr later submitted a request for intermittent, rather than continuous, leave covering a period from March 13, 2017, through June 4, 2017.  (*Id.* at 127:11-21.)  Masterson-Carr later extended the terminal date of her intermittent leave to September 13, 2017.  (Ex. P, DREXEL 00223-DREXEL 00229.)  Significantly, Masterson-Carr testified that this extension garnered no disapproval from her superiors at the College.  (Pl. Dep. 194:12-17.)

### D.  The Kukla investigation

On April 19, 2017, Masterson-Carr joined two subordinates—Moira McGoldrick and Ashley Kukla—at Thomas Jefferson Hospital to support another employee whose mother lay gravely ill.  (Kukla Aff. ¶ 11, Ex. L, ECF 13-3; McGoldrick Aff. ¶ 8, Ex. M, ECF 13-3.)  Afterward, Masterson-Carr, McGoldrick, and Kukla went to the Comcast Center for lunch.  (Kukla Aff. ¶ 13; McGoldrick Aff. ¶ 11.)  Over lunch, Masterson-Carr asked Kukla, "either what medicine did you take, or did you take your medicine today."  (Pl. Dep. 101:9-11.)  Masterson-Carr explained at her deposition that she asked the question "[b]ecause [Kukla's] behavior was off the wall at the hospital."  (*Id.* at 99:22-24.)  Importantly, Masterson-Carr was aware that Kukla suffered from anxiety and took medication to control it.  (Kukla Aff. ¶¶ 6-7; Pl. Dep. 102:14-17.)

Kukla reported the incident to Esposito a week later, and Esposito informed Masterson-Carr about Kukla's complaint during their regularly scheduled meeting.  (Kukla Aff. ¶ 16; Pl. Dep. 94:22-95:13; Investigative Report, Ex. O, at DREXEL 00129, ECF 13-4.)  When Masterson-Carr learned about the complaint, she responded that "this is another situation that's going to get escalated to HR then I'm going to resign because [of my] reputation, I couldn't handle another."  (Pl. Dep. 105:11-14.)  She explained that the circumstances counseled

4

resignation because "three different complaints in less than a year [means] I obviously wasn't the right fit."[2]  (*Id.*)

The University's Office of Human Resources ("HR") launched an investigation into the complaint led by HR Business Partner Jennifer Gallagher.  (Ex. O, at DREXEL 00129.)  During her investigation, Gallagher interviewed Masterson-Carr, McGoldrick, and Kukla.  (*Id.* at DREXEL 00129-DREXEL 00130.)  Gallagher also gave Masterson-Carr specific instructions that she was not to communicate with anyone about the substance of the investigation.  (Pl. Dep. 114:16-115:14.)  That, however, did not deter Masterson-Carr from confronting Kukla to express her disappointment at the allegations because Masterson-Carr believed she and Kukla "had a better relationship than that."  (*Id.* at 115:15-116:22.)  Kukla responded that Masterson-Carr's comments over lunch struck a nerve because they suggested that Masterson-Carr believed Kukla "was crazy."  (Kukla Aff. ¶ 19; Pl. Dep. 116:1-5.)

Despite being cautioned by Gallagher, Masterson-Carr concedes she questioned McGoldrick on two separate occasions to learn what she told HR.  On May 8, 2017, Masterson-Carr asked McGoldrick what she intended to tell Gallagher at their meeting that day and communicated her expectation that McGoldrick would give her the details of what she discussed with Gallagher afterward.  (Ex. O, at DREXEL 00135.)  McGoldrick contacted Gallagher on May 24, 2017, to confirm that, after their previous meeting, Masterson-Carr demanded to know what McGoldrick had said.  (*Id.* at DREXEL 00136.)  Discomfited, McGoldrick told Masterson-Carr to direct her questions about the investigation to HR.  (*Id.*; McGoldrick Aff. ¶ 27.)

---

[2] Masterson-Carr was also the subject of a November 2016 investigation into other allegedly discriminatory remarks she made toward employees in her department, including remarks about Muslim women.  In her Opposition, Masterson-Carr challenges the investigation's relevance to my adjudication of Drexel's Motion.  I will disregard this investigation because, as more fully explained below, Drexel did not incorporate this investigation into its decision to terminate Masterson-Carr, whereas it did so explicitly in reference to the earlier August 2016 probe.  It is included here only to provide context for Masterson-Carr's reference in her deposition to there being three incidents.

Masterson-Carr remained undeterred and continued her efforts to pry from McGoldrick any hint about what she discussed with HR.  (Ex. O, at DREXEL 00136.)  When questioned at her deposition about McGoldrick's accusations, Masterson-Carr testified that she did not recall asking McGoldrick about her meeting with HR, but she "[was] sure it happened."  (Pl. Dep. 124:4-7.)

On May 9, 2017, a day after the McGoldrick encounter, Masterson-Carr went out on another period of continuous FMLA leave.  (Ex. P, at 2, ECF 13-3; Pl. Dep. 193:21-194:8.)  On or about June 5, 2017, while Masterson-Carr was out on leave, Gallagher concluded her investigation and drafted a report summarizing her findings.[3]  Based on the evidence collected, Gallagher made the unequivocal recommendation that Masterson-Carr be terminated immediately.  (Ex. O, at DREXEL 00138.)  She offered several reasons:

- Masterson-Carr's interrogations of Kukla and McGoldrick about what they told HR "violated Drexel policies OED-1 and CP0-4 pertaining to retaliation" because Masterson-Carr's conduct "had the effect of intimidating" Kukla and McGoldrick and, thus, "interfering with HR's investigation" of Kukla's allegations.
- Masterson-Carr's "comments about Ms. Kukla's medical condition and medications" also violated the University's policy against discrimination on the basis of disability.
- Masterson-Carr "continued to display poor judgment when interacting with subordinate employees in her unit" as evidenced by the fact that Masterson-Carr was also the subject of an investigation for allegedly discriminatory remarks she made in August 2016.
- OED concluded in 2016 that even though Masterson-Carr's actions did not violate the non-discrimination policy, they nonetheless constituted inappropriate behavior in the workplace and exhibited a "continuing pattern of inappropriate comments to and conversations with her direct reports similar to those documented in the previous OED investigation."  (*Id.*)

---

[3] Gallagher's report is undated, but I am confident from the record that it was drafted before Masterson-Carr requested an extension of leave on June 9, 2017.  Gallagher makes explicit reference to a meeting she had with Masterson-Carr on June 5, 2017 to discuss the concerns that McGoldrick had raised.  (Ex. O, DREXEL 00136.)  More significantly, the record is clear that Gallagher contacted Esposito on June 7, 2017, to inform him that Drexel had begun its internal termination process.

Gallagher therefore found that Masterson-Carr's immediate discharge was warranted.[4]

### E. Masterson-Carr's termination

Gallagher contacted Esposito on June 7, 2017, to confirm that Drexel was moving forward with Masterson-Carr's termination, and she memorialized their conversation in an email to herself afterward. (Ex. R, at DREXEL 00316, ECF 13-4.) The next day, on June 8, Gallagher sent Esposito an email about changes she made to a key termination document and also asked Esposito to schedule a meeting with Masterson-Carr to occur when she returned to the office. (Ex. S, at DREXEL 00376, ECF 13-4.) Masterson-Carr testified at her deposition that she requested an extension of her intermittent leave the following day on June 9, 2017, pursuant to her doctor's instructions late that day, and that Esposito learned about her request on June 12, 2017. (*Id.* at 131:1-18; 168:17-23.) Specifically, Masterson-Carr testified that Esposito sent her a text on June 12 asking to speak with her the next day when she was scheduled to return to the office, to which Masterson-Carr replied that she had extended her return date. (*Id.* at 131:1-18.)

Gallagher and Esposito told Masterson-Carr on June 14, 2017, that she would be discharged effective July 1, 2017, in connection with the violations of Drexel's policies unearthed during the investigation of Kukla's complaint. (*Id.* at 139:8-140:10; 162:16-163:3.) The University confirmed Masterson-Carr's termination with a letter to that effect the next day. (Masterson-Carr's Termination Letter, Ex. T, at DREXEL 00144, ECF 13-4.) At her deposition, Masterson-Carr reiterated the central theme of her case that her termination was retaliatory because it followed her request for an extension. (*Id.* at 137:8-12.) But when confronted with

---

[4] Gallagher noted that "Drexel Human Resources Policy HR-43, Performance Improvement Process, authorizes immediate termination of employment, without prior notice or without a prior PIP, in instances of gross misconduct or serious negligence or circumstances under which the supervisor, in consultation with HR Partner, determines that the nature, frequency or severity of the work-related problem warrants such action." (Ex. O, at DREXEL 00138.)

the emails between Gallagher and Esposito, Masterson-Carr was forced to admit that the College

began her termination before she requested the extension of leave.  (Pl. Dep. at 136-22-137:3;

137:13-17.)

## II.    Standard of Review

This Motion is governed by the well-established standard for summary judgment set forth

in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23

(1986).

## III.   Discussion

### A.  Retaliation Claim

Masterson-Carr alleges in Count I of the Complaint that Drexel terminated her in

retaliation for extending her FMLA leave, citing as evidence the fact that "[Esposito] only took

action to terminate [Masterson-Carr's] employment after learning that her leave was extended."

(Compl. ¶¶ 17, 22; *see also* Pl. Interrog. ¶ 21, Ex. V, ECF 13-4.)  To establish a retaliation claim,

Masterson-Carr must prove Drexel's retaliatory intent, which courts in this Circuit assess

"through the lens of employment discrimination law."  *Lichtenstein v. Univ. of Pittsburgh Med.*

*Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012).  Retaliation claims based on circumstantial evidence are

therefore properly analyzed under the burden-shifting framework set forth in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, Masterson-Carr must first

establish a *prima facie* case of retaliation.  *Lichtenstein*, 691 F.3d at 302.  If she does, the burden

shifts to Drexel to advance a legitimate, nondiscriminatory reason for her termination.  *Id*.  If

Drexel succeeds, Masterson-Carr must show that Drexel's articulated reason is pretextual.  *Id*.

Viewing the facts in the light most favorable to Masterson-Carr, I conclude that she is unable to

establish a *prima facie* case because no causal nexus exists between her request for an extension

of leave and her termination.  Even if she could establish a *prima facie* case, Drexel has

advanced a legitimate, nondiscriminatory reason for her discharge that no reasonable factfinder could conclude was pretextual.

### 1. *Masterson-Carr fails to establish a prima facie case.*

Masterson-Carr's first task is to establish a *prima facie* case of retaliation.  To do that, she must show "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." *Lichtenstein*, 691 F.3d at 302.  Masterson-Carr asserts, and Drexel concedes, that the first two elements are met.  So, the dispute turns on whether Masterson-Carr has pointed to evidence supporting the third element—causation.  Drexel asserts that Masterson-Carr's *prima facie* case fails at the causation element "because [Masterson-Carr] cannot point to any record evidence that there was a causal link between her protected activity and the termination of her employment." (MSJ, at 19.)  I agree.

When probing the causal link between a protected activity and termination of employment, courts should determine whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000) (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)). The Third Circuit has pointed to three factors helpful to that inquiry:  (1) close temporal proximity between the protected conduct and termination; (2) a record that the employer subjected the employee to ongoing antagonism; and (3) an employer's inconsistent reasons for terminating the employee.  *Id.*

At first glance, some aspects of Masterson-Carr's allegations would appear to create a close question.  To start, unlike in the typical retaliation case, Masterson-Carr alleges that Drexel retaliated against her for *extending* her FMLA leave, not for taking leave in the first place.  That

raises an added element of concern because Masterson-Carr was already engaged in the protected conduct when she was terminated; in fact, she sought additional protection.  Viewed in isolation, the closeness of Masterson-Carr's discharge to her request for an extension of FMLA leave might seem to support her claim, given that only five days elapsed between the two events. Upon closer scrutiny, however, the evidence does not support an inference of discrimination.

**Masterson-Carr has not established relevant temporal proximity.**  In the Complaint, Masterson-Carr alleges that the proximity between her request for an extension of leave and later termination from employment provides circumstantial evidence that Drexel retaliated against her for the extension.  That allegation rests on a faulty premise—that proximity alone necessarily provides circumstantial evidence of retaliation.  On the contrary, the *sequence* of events is also critical to determining whether retaliation occurred.

The timeline established by the record fatally undermines Masterson-Carr's allegation because, temporal proximity notwithstanding, Drexel made the decision to fire her *before* she requested an extension of leave under FMLA.  Sometime around June 5, 2017, Jennifer Gallagher finished her investigation into Kukla's complaint and concluded that Masterson-Carr should be terminated.  On the morning of June 7, 2017, Gallagher informed Esposito that Drexel had already begun its internal process of discharging Masterson-Carr from her employment, and Gallagher documented that conversation in an email to herself shortly thereafter.  (Ex. R, at DREXEL 00316.)  The next day, on June 8, 2017, Gallagher and Esposito exchanged emails to determine how and when they would communicate to Masterson-Carr that she was being terminated.  (Ex. S, at DREXEL 00376.)  Crucially, Masterson-Carr admitted that she did not request an extension of her intermittent leave until late in the day on June 9, 2017, and she further admitted that Esposito did not learn of the extension until June 12, 2017.  (Pl. Dep. at

131:1-18; 168:17-23.)  The record makes clear that Drexel laid all the groundwork for Masterson-Carr's termination days before Masterson-Carr requested the extension of her leave.

Drexel argues that my analysis in *Simpson v. Temple Univ.*, 2019 WL 5423015 (E.D. Pa. Oct. 23, 2019), is "instructive" in understanding why Masterson-Carr's claim fails.  I agree.  The plaintiff in *Simpson* was discharged after a verbal confrontation with an employee she did not supervise directly.  *Id*. at *1.  After investigating, the plaintiff's supervisor concluded that termination was warranted and emailed human resources—twice—to start that process.  Four days after her supervisor started the machinery of termination, the plaintiff invoked her right to FMLA.  *Id*. at *2.  I concluded that the ensuing FMLA retaliation claim failed because the plaintiff's request for FMLA could not have factored into her supervisor's decision-making process since he decided to terminate her before she took leave.  *Id*. at *3.  That conclusion applies here with equal force:  Masterson-Carr's request to extend her leave cannot be said to have influenced Drexel's decision to terminate because Drexel began discharge procedures at least two days before Masterson-Carr submitted her request.

***The record does not reveal a pattern of antagonism or inconsistent reasons for termination.***  Masterson-Carr's *prima facie* case also founders because the evidence in the record shows no one objected to her use or previous extensions of leave, and Drexel's reasons for discharging her remained consistent.  Masterson-Carr first began to use continuous leave in March 2017 for a period lasting from March 13 to March 26, 2017.  (Ex. F, at DREXEL 00219-DREXEL 00220.)   Later that same month, she made a request for intermittent leave that would cover the period from March 13, 2017, through June 4, 2017.  (Pl. Dep. 127:11-21.)  She then extended the end date to September 13, 2017.  (Ex. P, at DREXEL 00223-DREXEL 00229.) The record shows that no one objected to Masterson-Carr's requests at any point, including when

she was terminated.  In fact, Masterson-Carr testified that no one at Drexel questioned her

effectiveness as an employee due to her absence, and she never received a negative review of her

substantive performance while employed at Drexel.  (Pl. Dep. 63:1-5; 71:18-20.)  Masterson-

Carr intimates, rather than establishes, antagonism when she asserts that "Mr. Esposito was

known to negatively regard employees who missed time from work because of illness."  (Opp.

Br., at 2, ECF 18.)  But if he harbored such personal views, they did not affect his management

decisions.  For all of Esposito's alleged hostility to worker absence, at least one other employee

under Masterson-Carr's purview took FMLA leave without consequences despite poor

performance on the job.  (*Id.* at 194:18-196:13.)  And Masterson-Carr's deposition testimony

confirmed her understanding that Drexel's only articulated reason for terminating her was her

violation of the school's employment policy.  (*Id.* 139:8-140:10; 162:16-163:3.)  The record

therefore supports the conclusion that Masterson-Carr was neither subjected to antagonism nor

offered shifting explanations for her discharge.

Taking the record as a whole, I conclude that Masterson-Carr has not advanced a *prima

facie* case of retaliation.  But I will nonetheless assume for the sake of discussion that she has

done so and proceed to analyze the record as it relates to the second and third steps of the

*McDonnell-Douglas* framework.

> 2. *Drexel had a legitimate, nondiscriminatory reason for termination that no
> rational trier of fact could consider pretextual.*

I am mindful at this stage of the analysis that Drexel's "burden is 'relatively light' and its

explanation for firing [Masterson-Carr] must simply 'permit the conclusion that there was a

nondiscriminatory reason for the unfavorable employment decision.'"  *Capps v. Mondelez Glob.

LLC*, 147 F. Supp. 3d 327 (E.D. Pa. 2015) (Pappert, J.), *aff'd*, 847 F.3d 144 (3d Cir. 2017)

(quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)).  On the evidence here, Drexel easily meets that burden.

As Masterson-Carr's deposition testimony confirms, Drexel terminated Masterson-Carr based on her troubling conduct toward Kukla and other employees.  Gallagher's thorough and detailed investigative report provides insight into why the school believed Masterson-Carr's behavior to be a problem.  The report advanced two main reasons supporting her termination: Masterson-Carr's discriminatory comments to Kukla regarding her mental state and her retaliatory behavior toward Kukla and McGoldrick.  (Ex. O, at DREXEL 00138.)  Both constituted separate and independent violations of school policy.  (*Id*.)  Masterson-Carr does not dispute that she made the comment that prompted Kukla to lodge a complaint.  In fact, she admitted both that she made the comment and that it offended Kukla.  (Pl. Dep. 117:20-21.)  She also admitted that she confronted Kukla about the complaint after learning of it during her meeting with Esposito.  (*Id*. at 119:5-7.)  And though Masterson-Carr lacked clarity about her behavior toward McGoldrick, she conceded the exchange took place (Pl. Dep. 124:4-7) and the investigative report shows she admitted to Gallagher that the substance of McGoldrick's accusations were true.[5]

Even beyond that, Masterson-Carr's reactions at the time demonstrate an awareness that her conduct was highly troubling.  When Esposito told her that Kukla had lodged a complaint, Masterson-Carr responded that she believed the complaint demanded her resignation because it was another illustration that she was not "the right fit" for her position.  (*Id*. at 105:11-14.)

---

[5] Gallagher recorded in the report that Masterson-Carr "confirmed that after Ms. McGoldrick returned from HR, she pulled Ms. McGoldrick into her office and asked her what happened."  (Ex. O, at DREXEL 00136.)  Further, Masterson-Carr "stated that she [did] not see what the concern [was] with [that] action."  (*Id*.)  The admission prompted Gallagher to explain that Masterson-Carr had been "specifically asked not to talk about the details of the investigation outside of HR" because doing so raised the specter of "retaliatory behavior."  (*Id*.)

Gallagher's report reinforces that conclusion.  The report tied Masterson-Carr's conduct to specific violations of Drexel policies against discrimination and retaliation, and it described the nature of that conduct in exhaustive detail.  Further, the report evaluated Masterson-Carr's conduct in April 2017 in light of her earlier insensitive behavior, concluding that the Kukla incident demonstrated a "continuing pattern of inappropriate comments to and conversations with her direct reports similar to those documented in the previous OED investigation."  (Ex. O, at DREXEL 00138.)

Given the volume of evidence set forth in the report and the thoroughness of its findings, it is hard to characterize Drexel's reasons for terminating Masterson-Carr as anything other than legitimate and nondiscriminatory.  Masterson-Carr's conduct toward Kukla and McGoldrick was improper, and Drexel acted accordingly.  Drexel's consistency and clarity about its reasons for terminating Masterson-Car lend further credence to the legitimacy of its reasons for taking the action in the first place.  Viewing the record as a whole, I conclude as a matter of law that Drexel has satisfied its burden under *McDonnell-Douglas*, and I further conclude that Masterson-Carr cannot sustain hers because no reasonable trier of fact would find Drexel's proffered reasons for termination to be pretextual.

### B.  State law wrongful termination claim

Masterson-Carr also raises a claim under Pennsylvania law, asserting in conclusory terms that her termination violated public policy.  There are multiple flaws in this claim.  First, Pennsylvania recognizes such a cause of action only under the rarest of circumstances because it is the province of the legislature to set policy—not the courts.  *Weaver v. Harpster*, 975 A.2d 555, 564 (Pa. 2009).  Second, standing alone, a potential violation of federal law will not suffice to create a violation of public policy under Pennsylvania law.  The Pennsylvania Supreme Court has held that "a bald reference to a violation of a federal regulation, without any more

14

articulation of how the public policy of this Commonwealth is implicated, is insufficient to overcome the strong presumption in favor of the at-will employment relation." *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 290 (Pa. 2000). Here, Masterson-Carr offers no analysis of how her termination represents a violation of sound public policy. Finally, as a matter of simple logic, evidence that is insufficient to support a federal claim of unlawful termination is equally insufficient to support a state law claim grounded in the same conduct.

**IV.    Conclusion**

For the reasons set forth above, Drexel's Motion will be granted, and Masterson-Carr's Complaint dismissed in its entirety.

/s/Gerald Austin McHugh
United States District Judge

15